## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IOENGINE, LLC,<br>　　　　*Plaintiff/Counterclaim Defendant,*<br><br>v.<br><br>PAYPAL HOLDINGS, INC.,<br>　　　　*Defendant/Counterclaim Plaintiff.* | § § § § § § § | C.A. No. 18-452-WCB<br><br>JURY TRIAL DEMANDED |
| INGENICO INC.,<br>　　　　*Plaintiff,*<br><br>v.<br><br>IOENGINE, LLC,<br>　　　　*Defendant.* | § § § § § § § § § | C.A. No. 18-826-WCB<br><br>JURY TRIAL DEMANDED |
| IOENGINE, LLC,<br>　　　　*Counterclaim Plaintiff,*<br>v.<br><br>INGENICO INC., INGENICO CORP., and<br>INGENICO GROUP SA,<br>　　　　*Counterclaim Defendants.* | § § § § § § § § | |

## IOENGINE, LLC'S
## OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Noah M. Leibowitz
Gregory T. Chuebon
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500
noah.leibowitz@dechert.com
greg.chuebon@dechert.com

SMITH, KATZENSTEIN & JENKINS LLP

Neal C. Belgam (No. 2721)
Eve H. Ormerod (No. 5369)
Beth A. Swadley (No. 6331)
1000 West Street, Suite 1501
Wilmington, Delaware 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com
bswadley@skjlaw.com

*Counsel for IOENGINE, LLC*

Dated:  July 15, 2019

# TABLE OF CONTENTS

**Page**

I.      NATURE AND STAGE OF PROCEEDINGS ..................................................... 1

II.     INTRODUCTION ............................................................................................... 1

III.    OVERVIEW OF THE TECHNOLOGY ............................................................ 1

IV.     LEGAL STANDARD .......................................................................................... 3

V.      ARGUMENT ....................................................................................................... 4

    A.    "interactive user interface" ........................................................................ 4

    B.    The "Through" Terms ................................................................................. 8

    C.    The "Communication From the Terminal" Terms ...................................... 11

    D.    Ingenico's "Memory," "Communications Network" and "Node" Terms .......... 12

        1.    "memory" — All Asserted Independent Claims ................................... 133

        2.    "communications network" — '047 Patent, Claim 12 ......................... 14

        3.    "node" — All Asserted Independent Claims ........................................ 15

    E.    The "Program Code" Terms ....................................................................... 156

    F.    None of the Claims of the Patents-in-Suit are Indefinite .................................. 17

VI.     CONCLUSION .................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

<span style="font-variant: small-caps">Cases</span>

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
   350 F.3d 1365 (Fed. Cir. 2003)..................................................................................16

*Apple, Inc. v. Samsung Elecs. Co.*,
   No. 11-CV-01846, 2012 WL 2993856 (N.D. Cal. July 20, 2012)................................8, 14, 15

*Audionics Sys., Inc. v. AAMP of Florida, Inc.*,
   No. cv 12-10763, 2013 WL 9602634 (C.D. Cal. Sept. 12, 2013) ..........................................14

*Bosch Auto. Serv. Sols., LLC v. Matal*,
   878 F.3d 1027 (Fed. Cir. 2017)..................................................................................17

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
   677 F.3d 1361 (Fed. Cir. 2012)..................................................................................17

*E.I. du Pont De Nemours & Co. v. Unifrax I LLC*,
   921 F.3d 1060 (Fed. Cir. 2019)....................................................................................4

*Edgewell Pers. Care Brands, LLC v. Albaad Massuot Yitzhak*,
   No. 15-1188, 2017 WL 1900736 (D. Del. May 9, 2017) ......................................................19

*Freeny v. Fossil Grp.*,
   No. 2:18-cv-00049, 2019 WL 2078783 (E.D. Tex., May 10, 2019) .....................................18

*Gillette Co. v. Energizer Holdings, Inc.*,
   405 F.3d 1367 (Fed. Cir. 2005)..................................................................................16

*GPNE Corp. v. Apple Inc.*,
   830 F.3d 1365 (Fed. Cir. 2016)....................................................................................4

*IOENGINE, LLC v. Imation Corp.*,
   C.A. No. 14-1572, D.I. 102 (D. Del. Mar. 21, 2016)..........................................................13

*IOENGINE, LLC v. Interactive Media Corp.*,
   C.A. No. 14-1571, D.I. 67 (D. Del. Mar. 21, 2016)............................................................13

*MasterMine Software, Inc. v. Microsoft Corp.*,
   874 F.3d 1307 (Fed. Cir. 2017)..................................................................................18

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
   520 F.3d 1367 (Fed. Cir. 2008)..................................................................................18

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 747 (Fed. Cir. 2016)..................................................................................10

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...............................................................3

*President & Fellows of Harvard College v. Micron Tech., Inc.*,
C.A. No. 17-1729, 2018 WL 565309 (D. Del. Jan. 26, 2018)....................................8

*Tech Pharmacy Servs., LLC v. Alixa Rx LLC*,
No. 4:15-cv-766, 2016 WL 6397358 (E.D. Tex. Oct. 28, 2016)...............................13

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014).............................................................................4, 10

OTHER AUTHORITIES

U.S. Patent No. 8,539,047................................................................................ passim

U.S. Patent No. 9,059,969.........................................................................1, 15, 17, 18

U.S. Patent No. 9,774,703.............................................................................1, 17, 18

## I.     NATURE AND STAGE OF PROCEEDINGS

On March 23, 2018, IOENGINE, LLC ("IOENGINE") filed a patent infringement action against PayPal Holdings, Inc. ("PayPal"), asserting U.S. Patent Nos. 8,539,047 (the "'047 Patent"), 9,059,969 (the "'969 Patent"), and 9,774,703 (the "'703 Patent") (the "Patents-in-Suit").  Following an indemnity request from PayPal, Ingenico Inc. filed a declaratory judgment action for non-infringement of the Patents-in-Suit.  IOENGINE then counterclaimed for infringement by Ingenico Inc., Ingenico Corp., and Ingenico Group SA (together, "Ingenico") (PayPal and Ingenico, collectively, "Defendants").  The cases have been consolidated and share all dates until trial.  D.I. 49.[1]

## II.     INTRODUCTION

IOENGINE submits this brief in support of its proposed claim constructions and in response to the claim constructions proposed by PayPal and by Ingenico.[2]  The claim terms at issue are straightforward terms that would be well understood by a person of ordinary skill in the context of the patent specifications.  Each of IOENGINE's proposed constructions is fully supported by the intrinsic evidence as well as the canons of claim construction.

## III.     OVERVIEW OF THE TECHNOLOGY

The Patents-in-Suit are from the same patent family and claim priority to the same underlying application, filed March 23, 2004.

---

[1] Unless otherwise noted, where cited material appears on both dockets, docket citations are to C.A. No. 18-452.

[2] Pursuant to the Court's January 28, 2019 Revised Scheduling Order (D.I. 49) and the parties' June 19, 2019 meet and confer regarding claim construction, IOENGINE's brief addresses both Defendants' terms, and Defendants will file a joint responsive brief.

The Patents-in-Suit claim an apparatus, system, and method relating to a portable device, referred to in the specification as a tunneling client access point ("TCAP").  *See* '047 Patent at Abstract.[3]  The TCAP enables a specific manner of communication with an access terminal (*e.g.*, a computer or cellphone) and with a remote network device (*e.g.*, a server) by "tunneling" data through the terminal's network interface.  *Id*. at 2:39-51, 3:42-4:31, Figs. 1, 9-10.

At the time of the invention, portable computing systems were "bulky, provide[d] uncomfortably small user interfaces, and require[d] too much power to maintain their data."  *Id*. at 2:28-51.  These designs were also complicated and expensive, because "they require[d] great processing resources to provide custom user interfaces and operating systems."  *Id*.  There was no portable computing system that "allow[ed] users to employ traditional large user interfaces they are already comfortable with," as well as "provid[ed] security for data on the device."  *Id*. To combat these problems, the Patents-in-Suit provide for "a highly secure, portable, power efficient storage and data processing device."  *Id*. at Abstract, 3:42-4:51.  The TCAP is easy to use, requiring the user to simply plug it into an existing terminal, such that "the TCAP can make use of a traditional user interface and input/output (I/O) peripherals, while the TCAP itself, otherwise, provides storage, execution, and/or processing resources."  *Id*. at 2:25-51.

Users interact with the TCAP through an interactive user interface ("IUI"), which is presented on the terminal and makes use of the terminal's I/O components.  *Id*. at 3:58-61, 17:51-18:3, 26:19-20 ("The user interface provides a facility through which users may affect, interact, and/or operate a computer system.").  The IUI is the type of "traditional large user interfaces [that users] are already comfortable with" and makes use of "computer interaction

---

[3] The Patents-in-Suit share nearly identical specifications. As such, patent specification citations are to the '047 Patent only.

interface elements," such as check boxes, cursors, menus, etc. to facilitate interaction with and the operation of the system.  *Id*. at 2:35-37, 1:52-56.

In addition to providing the IUI, the terminal serves as a "conduit" or "bridge" through which the TCAP can communicate with a server or other network devices by "tunneling" data through the terminal.  *Id*. at Abstract, 4:61-65, 28:54-57.  Importantly, "tunneling" enables the user to transmit and receive data between the TCAP and the network *without* the data being resident on the terminal.  *Id*. at Abstract, 4:22-31 ("Thus, to the user, the contents of the TCAP appear on the AT as being contained on the TCAP even though much of the contents may actually reside on the servers and/or the servers' storage facilities.  ***In these ways, the TCAP 'tunnels' data through an AT***")[4], 12:63-13:17, 27:28-28:15.  To prevent the terminal from accessing information sent between the TCAP and the server, the TCAP secures data such that "if data moving out of the TCAP and across the [terminal] were captured at the [terminal], such data would not be readable."  *Id*. at 13:1-5, 27:28−28:15, Fig. 10.  In this way, the TCAP "maintain[s] high levels of data security" by allowing the user to access data without that data being accessible to the terminal.  *Id*. at Abstract.

## IV.     LEGAL STANDARD

For purposes of claim construction, although "the claims themselves provide substantial guidance as to the meaning of particular claim terms..., [t]he claims, of course, do not stand alone."  *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314-15 (Fed. Cir. 2005) (*en banc*).  Rather, "the specification 'is always highly relevant to the claim construction analysis [and] [u]sually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. at 1315 (quoting

---

[4] Emphasis added and internal citations and quotations omitted throughout.

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The Court "'cannot look at the ordinary meaning of [a] term ... in a vacuum' but must consider 'the context of the written description and the prosecution history.'" *E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1068 (Fed. Cir. 2019) (quoting *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005). Furthermore, "[t]he fact that [a particular characteristic] is 'repeatedly and consistently' used to characterize the invention strongly suggests that it should be read as part of the claim." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014) (quoting *Eon-Net LP v. Flagstar Bancorp.*, 653 F.3d 1314, 1321-23 (Fed. Cir. 2011)); *see also GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370-71 (Fed. Cir. 2016) (when a patent "repeatedly and consistently" characterizes the invention in a particular way, it is proper to construe the claims accordingly).

## V.   ARGUMENT

### A.   "interactive user interface"[5]

IOENGINE's proposed construction properly captures two key aspects of an interactive user interface ("IUI") as it is consistently described by the Patents-in-Suit: The IUI must be *interactive* (meaning it contains interface elements with which a user may interact); and the IUI on the *terminal* must act responsively to user interaction *by modifying what is presented*.

*First*, the specification explains throughout that the user interface is one with which the user *interacts*. *See e.g.,* '047 Patent at 6:65−7:1 (use of login or registration window to access TCAP), 7:13−15 (providing security verification), 7:46−52 (providing registration information), 8:38−46 (providing options to user to access, execute, and store data and programs), 9:41-49 ("a

---

[5] *See* Appendix A, Term 1.

button entitled 'My Stuff' may serve as a mechanism to advance the user to a screen where they

may access their personal data store"), 12:34−63 (providing user with options to view

promotional material, reports, presentations, financial data, live feeds, etc.), 26:7-14 (describing

user interface module).

The specification further explains that user interaction takes place by way of "computer

interaction interface elements such as check boxes, cursors, menus, scrollers, and windows…."

'047 Patent at 1:52-62; *see also id*. at Figs. 5-8 (showing various interaction interface elements

of an IUI). The interaction interface elements are not simply examples or suggestions. It is these

interaction interface elements which "allow for the display, execution, interaction, manipulation,

and/or operation of program modules and/or system facilities through textual and/or graphical

facilities," and "provide[] a facility through which users may affect, interact, and/or operate a

computer system." *Id*. at 17:58-63; *see also* 10:33-47 (engaging an interface element to

manipulate data), 11:14-18 (accessing help facilities by "engaging a help facility user interface

element"). The specification describes an interface that "present[s] the user with various options

in various and fanciful interface formats," and a number of ways that a user may interact with the

user interface, including "clicking on a button to open the TCAP facilities and services,"

"attempt[ing] to login to access their data by engaging an appropriate button," and "selecting an

appropriate button, which will advance the user to a registration screen wherein the user may

enter" personal information. *Id*. at 9:20-59.

Indeed, a central purpose of the invention of the Patents-in-Suit is to allow users to

interact with the TCAP by employing "traditional large user interfaces" that users "are already

comfortable with," as opposed to then-existing portable computing devices, which had

"uncomfortably small user interfaces." *Id*. at 2:25-37. This makes the disclosed TCAP easy to

5

use, as "at most it requires the user to simply plug the device into any existing and available desktop or laptop computer, through which, the TCAP can make use of a traditional user interface and input/output (I/O) peripherals…"  *Id.* at 2:37-46.

**Second**, the IUI on the *terminal* must act responsively to user interaction *by modifying what is presented*.  The specification repeatedly and consistently describes the IUI on the terminal acting responsively to user interaction by changing the presentation on the IUI.  *See, e.g.,* '047 Patent at 9:38-55 ("By engaging the user interface, perhaps by clicking on a button to open the TCAP facilities and services, the interface may further unfurl to present options to access said facilities and services"); 10:14-32 (engaging the interface by dragging and dropping files); 36−39, 10:65−11:5 (drag and drop); 11:14−32 (engaging user interface elements to access online storage), 62−67 (unfurling interface by graphically opening soda can); Figs. 5−8 (showing a terminals' various modifications to the presentation of the IUI based on user interaction).

Ingenico and IOENGINE agree that the IUI is "a presentation…with which a user may interact to result in the [terminal/computer] taking action responsively."  D.I. 86, Claim Construction Chart at 1.  However Ingenico's proposed construction fails to provide that the presentation contains *interface elements* and that the terminal takes action responsively *by modifying what is presented*.  In doing so, Ingenico's proposed construction does not comport with the specification's consistent description of the claimed IUI.

Moreover, Ingenico's construction ambiguously refers to "the computer," even though "computer" is not a term used by the claims of the Patents-in-Suit.  Instead, the claims refer to a "**terminal** comprising … a first output component" and make clear that the IUI is presented on the "first output component" of the terminal.  *E.g.*, '047 Patent at Claim 1, elements 1(a), 1(c)(1).  Ingenico's attempt to replace "terminal" with "computer" is problematic, because there are

6

multiple devices in the claims that might be considered computers.  *See, e.g.,* '047 Patent, Claim 1 (referring to a "portable device" and a "terminal," which both contain processors).  Notably, Ingenico has, in a petition for *inter partes* review of the '047 Patent, admitted that it is the "terminal" that takes responsive action.  *See* Ex. 1, Petition for Inter Partes Review, IPR2019-00416-1, 13 ("A number of the displays respond to text inputs from an input component to elicit *a responsive action from the terminal.*").

Additionally, Ingenico's construction states that the "user may interact" with the IUI, but fails to specify *how* the user interface itself is "interactive."  And Ingenico's construction includes "taking action responsively," but fails to explain what it means to do so.  As discussed above, the specification shows that what the inventor intended by the term "interactive user interface" was for the terminal to present one or more interface elements for the user to "engage" with.  The user's interaction with these "interaction interface elements" (*e.g.*, "check boxes, cursors, menus, scrollers, and windows") results in the terminal taking action responsively *to modify the presentation of the interface*.  *See, e.g.*, '047 Patent at 1:52−56, 8:20−22, 9:38−49, 10:20−24 (dragging and dropping files), 10:33−44 (drag-and-drop), 10:65−11:5 (drag-and-drop), 11:14−16 ("engaging a help facility user interface element"), 62−67 (unfurling interface by graphically opening soda can), Figs. 5−8 (showing a terminals' various modifications to the presentation of the IUI based on user interaction).  Ingenico's construction fails to reflect the clear teaching from the specification that the interactive user interface takes action responsively by modifying what is presented.

PayPal's competing proposed construction similarly suffers from a number of significant problems.  First, it is grammatically confusing and ambiguous.  Although PayPal's proposal specifies that the user interacts "in response *to*" a display," it is ambiguous as to *what* the user

interacts ***with***.  This ambiguity is more likely to confuse than help the jury and counsels against

adoption.  *See President & Fellows of Harvard College v. Micron Tech., Inc.*, C.A. No. 17-1729,

2018 WL 565309, at *4-5 (D. Del. Jan. 26, 2018) (considering potential jury confusion in

rejecting claim construction); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 WL

2993856, at *6 (N.D. Cal. July 20, 2012) (considering whether a construction is helpful or

"unhelpful for the jury to understand the term," and whether the "claim language itself …

provides more guidance than [a proposed construction]").  Second, PayPal's proposal fails to

make clear what, if anything, makes the user interface "***interactive***."  PayPal's construction

ignores that in order for a user interface to be interactive, there must be both an action taken by

the user and some action taken by the IUI that is responsive to the user (a point, as discussed

above, on which IOENGINE and Ingenico agree and that is supported by the teaching of the

Patents-in-Suit).  Third, PayPal's construction limits the user's interaction to being "in

response."  But, the user's interaction is not necessarily "in response" to the presentation, *i.e.*, the

user can initiate the interaction.  This is also evident from the specification.  *See e.g.* '047 Patent

at 9:38-55.  Finally, PayPal's proposal improperly limits the IUI to a "display."  *See* '047 Patent

at 14:60-15:13.[6]

      **B.**    **The "Through" Terms**[7]

      IOENGINE's construction of the "through" terms is true to and embodies the

specifications' consistent, repeated disclosure that the TCAP is configured to be able to

communicate ***through*** the terminal network interface to the communications node without the

---

[6] To account for audible or tactile interfaces, IOENGINE and Ingenico agree that the term
"presentation" should be used to describe the IUI.

[7] *See* Appendix A, Term 2 (A)-(E).

terminal having access to the information being communicated.

The Patents-in-Suit are directed to a portable device that may communicate with a remote networked device by "tunneling" data through the access terminal.  This is not exemplary or permissive language; it is a concept that is captured in the very title of the patents.  *See* '047 Patent at Title ("Apparatus, method and system for a ***tunneling*** client access point "), Abstract ("The disclosure details the implementation of a ***tunneling*** client access point (TCAP) ***that is a highly secure***, portable, power efficient storage and data processing device"), 2:39-51, 3:42-4:31.  In describing the TCAP, the specification consistently discloses that the TCAP is configured to be able to communicate information through the terminal network interface to a communications network node without the terminal having access to the information being communicated.  The Patents-in-Suit describe that "various encryption formats may be used by the TCAP to send information securely to the backend servers.  ***It is important to note that in such an embodiment, even if data moving out of the TCAP and across the AT were captured at the AT, such data would not be readable because the data was encrypted by the TCAP's processor.***"  *Id*. at 12:66-13:5.  *See also id*. at 27:28-28:15 (describing cryptographic module that "allow[s] for the secure transmission of information across a communications network to enable a TCAP module to engage in secure transactions if so desired.").  And, as the Patents-in-Suit explain, the information "tunneled" through the terminal is intended to be accessed only by the TCAP and/or the server, and not the terminal.  *Id*. at 13:1-5 ("such data would not be readable [by the AT] because the data was encrypted by the TCAP's processor"); 27:28-28:15 (disclosing tunneling through the use of a cryptographic server module).

The claims themselves make clear that tunneling is a specific type of communication, distinguishing between communication *with (or to)* the terminal and communication *through* the

terminal with or to the network server.  For example, Claim 1 of the '047 Patent discloses "wherein the portable device is configured to [*i*] communicate **with the terminal** and to [*ii*] communicate **through the terminal** network interface with the communications network node." The use of different terms ("with" vs. "through") in the claims indicates that these two types of communication are different.  *See, e.g.*, *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 752 (Fed. Cir. 2016) ("There is a canon of construction: 'the general assumption is that different terms have different meanings.'") (quoting *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1289 (Fed. Cir. 2008)).  Read in light of the specification, communication **through** the terminal network interface is communication in which the terminal has no access to the information being communicated.

Ingenico and PayPal argue that the plain and ordinary meaning of these terms should suffice.  However, this ignores that "[t]he fact that [a particular characteristic] is repeatedly and consistently used to characterize the invention strongly suggests that it should be read as part of the claim." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014).  And here, the concept of "tunneling" is central to the invention, as embodied in the claims referring to the TCAP communicating "through" the terminal's network interface with a network device (as opposed to communicating "with" the terminal).  *See* '047 Patent at Title, Abstract.  Ingenico agrees, as evidenced by its petition for Inter Partes Review of the '047 Patent.  *See* Ex. 1, IPR2019-00416-1, 6 ("Indeed, **encryption is of the essence to a tunneling client**," and defining tunneling as "the process of encapsulating an encrypted data packet in an IP packet for secure transmission across an inherently insecure IP network, such as the Internet").

Alternatively, PayPal argues that "through" should be construed to mean "by way of." But this fails to reflect the "tunneling" aspect of the claimed invention that is consistently

described in the specification.  Defendants' proposals each ignore the repeated and consistent disclosure in the specification that information communicated to the network is sent through the terminal without the terminal having access to that information.

### C.    The "Communication From the Terminal" Terms[8]

IOENGINE's construction of these terms reflects two teachings from the specification and claims: (i) the IUI is "on the terminal" and (ii) the communication resulting from user interaction with the IUI that is received by the TCAP is "from the terminal."  This communication from the terminal is the result of user interaction with the IUI on the terminal.

As explained above, the claims describe the IUI as being presented on a terminal's output component.  *See supra* at 6; '047 Patent at Claim 1 ("terminal comprising … a first output component;" "interactive user interface to be presented on the first output component [of the terminal]").  And the claims refer to only one input component—the input component on the terminal—with which to interact with the IUI.  *See, e.g.*, *id*.  The specification and claims similarly consistently refer to the IUI as being on the terminal.  *See* '047 Patent at 9:38-55 (describing the IUI on the terminal which provides access to the TCAP); *see also id.* at 2:40-44 (describing the connection of the TCAP to an existing computer as a terminal, "through which, the TCAP can make use of a traditional user interface and input/output (I/O) peripherals").

Thus, when the TCAP receives communications resulting from user interaction with the IUI *on* the terminal, they come *from* the terminal.  *See, e.g.*, '047 Patent at 9:29-32 ("the TCAP may be engaged to receive commands and execute by receiving a signal from the access terminal driver instructing it to execute certain program files"); *see also id*. at 4:50-54 ("[I]f the user takes

---

[8] *See* Appendix A, Term 3(A)-(G).

the action of opening a file from the TCAP's memory, e.g., *by double clicking on an icon* when the TCAP is mounted as a USB drive *on the AT*, then the AT may treat the TCAP as a memory device and retrieve information from the TCAP**"**); 9:6-19 ("Upon engaging the TCAP to an AT, the TCAP will mount and display through the AT's file browser window … the user may double click on the installer software stored on the TCAP.  Doing so will launch the installer software from the TCAP's memory to execute on the AT"); 28:46-29:14.

Defendants' approach to these claims terms fails to reflect either of these teachings. Moreover, Ingenico's proposed constructions, which address just two of the group of related claim terms, introduce added ambiguity.  Ingenico replaces the word "enables" with "makes … capable."  But "enables" is commonly understood, whereas Ingenico's construction results in the phrase "makes … capable to," an unusual and uncommon phrase that makes the claim no easier to understand.

### D.    Ingenico's "Memory," "Communications Network" and "Node" Terms

Ingenico proposes to construe multiple terms that already have plain, normal, ordinary meanings that one of ordinary skill in the art and the jury would readily understand: "communications network," "node," and "memory."  PayPal apparently agrees, having declined to propose these terms for construction.  For all three terms, the plain language of the claim provides more guidance than Ingenico's proposed constructions, which offer nothing beyond cumbersome, repetitive examples of the terms in question.  The Court should decline to construe these terms.

12

### 1.   "memory" — All Asserted Independent Claims[9]

The Patents-in-Suit describe numerous embodiments of memory, and are not limited in the types of memory they encompass.  *See* '047 Patent at 15:49-54 ("[A]ny mechanization and/or embodiment allowing a processor to affect the storage and/or retrieval of information is regarded as memory.  **However, memory is a fungible technology and resource, thus, any number of memory embodiments may be employed in lieu of or in concert with one another.**").  Ingenico's construction improperly seeks to convert a non-exclusive list of examples from the specification into a definition, and then states that memory "***may include*** flash memory, micro hard drives, ***and/or the like***."[10]  There is no reason to provide a construction that confusingly reiterates the term's already broad application when the term is easily comprehendible.

The term "memory" is readily understood by a juror, and no construction is required.  In fact, this same term has been interpreted by courts numerous times to have its plain and ordinary meaning, including in this District in prior litigations of the '047 Patent.  There is no reason to disrupt that previous finding.  *See IOENGINE, LLC v. Interactive Media Corp.*, C.A. No. 14-1571, D.I. 67 at 2 n.3 (D. Del. Mar. 21, 2016); *IOENGINE, LLC v. Imation Corp.*, C.A. No. 14-1572, D.I. 102 at 2 n.3 (D. Del. Mar. 21, 2016) (collectively, the "Prior Markman Orders") ("The court rejects [defendant's] proposed construction of the term 'memory'… .  The court agrees with IOENGINE that memory is a term that is readily understood and needs no construction.");  *see also, e.g., Tech Pharmacy Servs., LLC v. Alixa Rx LLC*, No. 4:15-cv-766, 2016 WL 6397358,

---

[9] *See* Appendix A, Term No. 4.

[10] Moreover, Ingenico's inclusion of the phrase "and/or the like" in its construction leaves the jury to interpret on their own what else "memory" may be under the open-ended definition, providing *less* guidance to a jury.

at *8 (E.D. Tex. Oct. 28, 2016) (construing "memory" to have its plain and ordinary meaning); *Audionics Sys., Inc. v. AAMP of Florida, Inc.*, No. cv 12-10763, 2013 WL 9602634, at *12-15 (C.D. Cal. Sept. 12, 2013) (same).  The Court should once again find that "memory" is readily understandable, requiring no construction.

2.      **"communications network" — '047 Patent, Claim 12**[11]

IOENGINE and PayPal agree that the term "communications network" needs no construction.  Ingenico's proposed construction does no more than provide a non-exhaustive, yet overwhelming, list of example communications networks.  It does not define the term "communications network" any more than listing all of Baskin-Robbins' thirty-one flavors would define the term "ice cream."  In fact, Ingenico's proposal, which appears verbatim in the specification, explicitly states that "[a] communications network **may be any one [of] and/or the combination of the following … .**"  '047 Patent at 14:45-53.  Clearly these passages do not purport to define the term "communications network," nor do they purport to limit the types of communications network that would fall within the scope of the claims.  These are only non-exhaustive examples that do not serve a central purpose of the invention, and the use of the modifiers "*e.g.*" and "and/or the like" show that they are non-limiting in nature.  *See id.* at 4:9-10, 4:16-21, 14:45-53.

Moreover, the plain language of the claim term is more easily understood and provides more guidance than Ingenico's proposed construction, which replaces the simple term "communications network" with a cumbersome, seventy-six-word list of repetitive and hyper-technical examples of communications networks.  *See, e.g.*, *Apple, Inc.*, 2012 WL 2993856, at *6

---

[11] *See* Appendix A, Term 5.

(considering whether a construction is helpful or "unhelpful for the jury to understand the term," and whether the "claim language itself provides more guidance than [a] proposed construction"). The result is a proposal that is much more likely to confuse than to help the jury.

### 3.    "node" — All Asserted Independent Claims[12]

As IOENGINE and PayPal agree, the term "node" as used by the claims needs no construction.  Ingenico proposes a construction based on a non-limiting and exemplary discussion of a "node" from the specification.

The specification states that "[a] computer, other device, software, or combination thereof that facilitates, processes information and requests, and/or furthers the passage of information from a source user to a destination user is *commonly* referred to as a 'node'" '047 Patent at 2:7-11.  This is not a limiting definition; it is merely a description of some things that *may* qualify as "nodes."

Moreover, the term "node" does not appear in a vacuum in the claims; the claims provide context by referring to a "*communications* node" or, alternatively, to a "*communications network* node."  *See, e.g.*, '969 Patent at Claim 1 ("…a *communications* **node** on the terminal to facilitate communications … to a *communications network* **node**"); *id.* at 1(c)(1) ("a *communications* **node** on the portable device to coordinate with the *communications* **node** on the terminal"). This context aids the reader in understand what is referred to by a "node," much more than Ingenico's confusing, extended list of examples.

### E.    The "Program Code" Terms[13]

PayPal proposes that five separate terms be replaced with a single, circular construction

---

that treats all five terms indistinguishably.  IOENGINE and Ingenico contend that these terms do

not need construction, and Judge Sleet agreed in the prior cases in this District.  *See* Prior

Markman Orders, at 2 ("To the extent that the surrounding claim language provides a context for

understanding 'first program code,' 'second program code,' and 'third program code,' the court

believes the meaning of these terms is clear when considered in the context of the entire claim.").

The five terms at issue identify separate and distinct numbered "program codes,"[14] but

PayPal's proposed construction treats the ordinal numbers as mere placeholders that have no

effect on the meaning of each distinct claim term.  But the use of ordinal identifiers to distinguish

various members of a group is a well-understood reading of claim language.  *See, e.g.*, *Gillette

Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1373 (Fed. Cir. 2005); *3M Innovative Props. Co.

v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("The use of the terms 'first' and

'second' is a common patent-law convention to distinguish between repeated instances of an

element or limitation").  Significantly, each of the differently numbered program codes in the

Patents-in-Suit has a *different* claimed functionality.  *See, e.g.*, '047 Patent at claim 1 (describing

a "first program code which… causes an interactive user interface to be presented on the first

output component" and a "second program code which … enables the portable device to (i)

receive a communication resulting from user interaction with the interactive user interface and

(ii) cause a communication to be sent through the terminal network interface to a

communications network node").  PayPal's construction, by removing the ordinal identifiers,

allows for the program codes to be identical, as each distinct claim term could be "all of one …

---

[14] The parties agree that there is no substantive difference between the descriptions "program code" and, as used in claim 24 of the '047 Patent, "processing code."  *See, e.g.*, Ex. 2, IPR2019-00884-1 at 11 n.2 ("[T]he only conclusion is that 'third processing code' means 'third program code.'").

program code file[], which … also comprise[s] … all of other numbered codes." This is contrary to the canons of claim construction, which presume that "different terms have different meanings." *See Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1396 (Fed. Cir. 2012). IOENGINE's understanding is also supported by the specification, which makes reference to numerous different "modules" that are "stored program code that is executed by the CPU." *See e.g.*, '047 Patent at 16:5-20 ("[t]he memory may contain a ***collection*** of program and/or database modules and/or data"); *id.* at 16:21-26 (operating system module); 16:50-52 (information server module); 17:51-53 (user interface module).

In addition, PayPal's proposed construction is confusingly circular, as PayPal first *removes* the reference to the numbering of the program codes, and then states that each program code "may also comprise part or all of other ***numbered*** codes." Should PayPal's constructions be adopted, the jury would be left searching for the very numbering that had been read out of the claims, rendering the constructions confusing and unhelpful to a jury.

F.      **None of the Claims of the Patents-in-Suit are Indefinite[15]**

PayPal asserts that '047 Patent Claim 1, '969 Patent Claim 1, and '703 Patent Claim 104 are indefinite "because they impermissibly claim both an apparatus and a method." But PayPal misunderstands the plain language of these claims and the law of indefiniteness.[16] These claims are unmistakably directed to a "portable device" apparatus ('047 Patent Claim 1 and '969 Patent

---

[15] *See* Appendix A, Term 8.

[16] PayPal bears the burden of proof in seeking to find these claims indefinite. *See Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017). IOENGINE believes that indefiniteness should be addressed in the first instance by PayPal before IOENGINE can properly respond. Nonetheless, IOENGINE includes this anticipatory argument regarding the definiteness of the asserted claims, but reserves the right to include responsive evidence and arguments after PayPal briefs indefiniteness.

17

Claim 1) and a "system" ('703 Patent Claim 104) that is configured in certain claimed ways, *not* to a method.

The claims do not require a series of steps to be performed.  Instead, they claim an apparatus or system with certain structures "***configured*** to" perform, and thus ***capable*** of performing, certain functions.  In other words, the limitations relate to capability, not requirements for action by a user.  *See MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315-16 (Fed. Cir. 2017) ("Though claim 8 includes active verbs—presents, receives, and generates—these verbs represent ***permissible functional language*** used to describe capabilities of the 'reporting module.'  Like the claims in *MEC*, *HTC*, and *UltimatePointer*, the claims at issue here merely claim that the system 'possess[es] the recited structure [that is] capable of performing the recited functions.'") (quoting *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008)).  The claims at issue do not require actions to be performed by a user, but rather "claim the system's capability to receive and respond to user selection."  *Id*. at 1316.  The Patents-in-Suit refer to a portable device that has program code "which, when executed," causes or enables certain functionality.  '047 Patent at Claim 1.  That is, the portable device has the claimed program code that causes or enables certain functionality ***when*** executed, and is not a requirement of a user using the portable device.  *See Microprocessor Enhancement*, 520 F.3d at 1375 (finding an apparatus "***determining***" a function "***when*** specified" not-indefinite because the claim was "clearly limited to [the apparatus] possessing the recited structure and *capable* of performing the recited functions") (second emphasis in original); *Freeny v. Fossil Grp.*, No. 2:18-cv-00049, 2019 WL 2078783, at *24 (E.D. Tex. May 10, 2019) (finding "***providing*** a predetermined service ***when*** activated in response to receiving information" to be "active functional language… properly used in

18

apparatus claims to denote capability of the apparatus"); *Edgewell Pers. Care Brands, LLC v. Albaad Massuot Yitzhak*, No. 15-1188, 2017 WL 1900736, at *5-6 (D. Del. May 9, 2017) (finding "**contacting**" and "**supporting**" "**while**… **being inserted** into said [user's] body" not indefinite as "simply describe[ing] the capabilities" of the claimed apparatus "based on a plain reading of the claims").

Accordingly, the challenged claims of the Patents-in-Suit are clearly directed to an apparatus or system, not a method, and are not indefinite.

## VI.   CONCLUSION

For the foregoing reasons, IOENGINE respectfully requests that the Court adopt IOENGINE's proposed constructions for each of the disputed terms.

Dated: July 15, 2019

OF COUNSEL:

Noah M. Leibowitz
Gregory T. Chuebon
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500
noah.leibowitz@dechert.com
greg.chuebon@dechert.com

SMITH, KATZENSTEIN & JENKINS LLP

*/s/ Eve H. Ormerod*
Neal C. Belgam (No. 2721)
Eve H. Ormerod (No. 5369)
Beth A. Swadley (No. 6331)
1000 West Street, Suite 1501
Wilmington, Delaware 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com
bswadley@skjlaw.com

*Counsel for IOENGINE, LLC*

19

## WORD COUNT CERTIFICATION

The undersigned counsel hereby certifies that IOENGINE, LLC's Opening Claim Construction Brief contains 5,471 words, which were counted by Eve H. Ormerod by using the word count feature in Microsoft Word.  The foregoing word count does not include tables or the signature/counsel blocks.


Dated:  July 15, 2019           */s/ Eve H. Ormerod*
                                Eve H. Ormerod