# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IOENGINE, LLC, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 18-452-WCB |
| PAYPAL HOLDINGS, INC., | § § § | |
| *Defendant*. | § § § | |
| | | |
| INGENICO INC., | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 18-826-WCB |
| IOENGINE, LLC, | § § § | **FILED UNDER SEAL** |
| *Defendant*. | § § § | |
| | | |
| IOENGINE, LLC, | § § | |
| *Counterclaim Plaintiff*, | § § § | |
| v. | § § § | |
| INGENICO INC., INGENICO CORP., and INGENICO GROUP S.A., | § § § § | |
| *Counterclaim Defendants*. | § § | |

**MEMORANDUM OPINION AND ORDER**

Defendant PayPal Holdings, Inc., ("PayPal") has filed a Motion for Spoliation Sanctions. Case No. 18-452, Dkt. No. 366. The Ingenico parties—Ingenico Inc., Ingenico Corp., and Ingenico Group S.A. (collectively, "Ingenico")—have filed a motion to join PayPal's Motion for Spoliation Sanctions. Case No. 18-826, Dkt. No. 333. In its motion PayPal alleges that plaintiff IOENGINE, LLC, through its principal, Scott McNulty, disposed of a key piece of evidence known as the "MediKey" device, and that spoliation sanctions should be imposed as a result. On April 6, 2022, I held a hearing on the motion, at which Mr. McNulty provided live testimony and other witnesses testified by deposition. Ingenico's motion to join PayPal's motion is GRANTED. For the reasons set forth below, PayPal's motion for spoliation sanctions is DENIED.

**I. Background**

IOENGINE alleges that PayPal and Ingenico have infringed various claims of U.S. Patent Nos. 9,059,969 ("the '969 patent") and 9,774,703 ("the '703 patent"). PayPal and Ingenico argue that they have not infringed the asserted patents and that the patents are invalid and unenforceable. With respect to the defenses and counterclaims of unenforceability because of inequitable conduct, PayPal and Ingenico allege that Mr. McNulty and/or his patent attorneys violated their duty of candor to the Patent and Trademark Office ("PTO"). They did so, according to PayPal and Ingenico, in two ways: (1) by submitting a false declaration to the PTO in 2010, during the prosecution of the asserted patents regarding the capabilities of the MediKey device, a prototype of Mr. McNulty's invention,[1] and (2) by withholding a prior art device known as the DiskOnKey during the prosecution with the specific

---

[1] The MediKey device is an off-the-shelf USB drive that Mr. McNulty purportedly modified to use custom firmware and hardware components.

2

intent to deceive the PTO. Dkt. No. 83, at 32–39, 47—50.[2] Similar allegations were made against Mr. McNulty by a defendant in an earlier action ("the Imation case"), but that action settled prior to a ruling on the inequitable conduct issue. *See generally IOENGINE LLC v. GlassBridge Enters., Inc.*, No. 1:14-cv-1572, Dkt. No. 210 (D. Del. Mar. 31, 2017). During that case, the parties' experts tested the MediKey device, but the experts disagreed about whether the prototype functioned as Mr. McNulty asserted. Dkt. No. 367 at 4; Dkt. No. 374 at 15–16. In the time since those tests were completed, the only remaining copy of the MediKey device has gone missing.

The circumstances surrounding the disappearance of the MediKey device are the subject of vigorous dispute among the parties. The defendants assert that Mr. McNulty destroyed or concealed the MediKey device in order to avoid its use as evidence against IOENGINE either at trial or at a separate inequitable conduct proceeding before me. The evidence developed during discovery into the circumstances leading to the disappearance of the MediKey device is murky on certain critical points and leads to no clear conclusion as to what happened to the device.

The record to date reveals the following regarding the events surrounding the disappearance of the MediKey, as shown by the evidence presented by the parties in the briefs and exhibits directed to the spoliation issue, as well as in testimony given at the spoliation hearing and in discovery proceedings conducted prior to the hearing.

During the Imation case and another contemporaneous action, IOENGINE's counsel at Simpson Thacher and Bartlett LLP ("Simpson Thacher") maintained possession of a number of prototypes that Mr. McNulty had created in the course of work that culminated in the '969 and '703 patents. In 2018, counsel for IOENGINE moved from Simpson Thacher to Dechert LLP. On June

---

[2] This citation and all subsequent citations to docket entries are to the docket in the PayPal case, No. 18-452.

20, 2018, after IOENGINE brought this lawsuit against PayPal, Mr. McNulty retrieved a box containing 33 prototypes, including the MediKey, from Simpson Thacher. Dkt. No. 368-1, Exh. 18 at 128:2–23. At the hearing, Mr. McNulty testified that he retrieved the prototypes so that they would not get lost or misplaced during his counsel's move to the Dechert firm. Mr. McNulty said he stored the box containing the prototypes in his laboratory, which is in the basement of his home in Norwalk, Connecticut. He stated that he regarded his laboratory as a safe place to keep the prototypes because it is kept locked, has dehumidification and air purification systems, and is generally off-limits to others. *See* Dkt. No. 451 at 52–54, 56–58, 66–68.

In August and September of 2018, after Mr. McNulty moved the prototypes to his laboratory, a series of incidents occurred at the McNulty home.

First, in the early morning of August 7, 2018, a tree fell in the front yard of the home, knocking down electrical lines connected to the home and damaging equipment on a utility pole nearby. Mr. McNulty noticed sparking from the transformer on the utility pole and called the fire department. *Id.* at 69–70, 74. Both the Norwalk Fire Department and Eversource Energy, the regional power company, responded to that incident. Mr. McNulty noticed that the power in the house seemed to be going off and on. The power company concluded that there was nothing wrong with its equipment, and Mr. McNulty's electrician, who checked the house that day for electrical malfunctions, also found nothing wrong. *Id.* at 71–73.

Second, on August 15, 2018, while Mr. McNulty was away from home, his wife, Lori McNulty, noticed that the lights in the house were flashing on and off, and she smelled smoke in the basement. Mrs. McNulty called the Rowayton Fire Department, which responded to the incident and discovered that two surge protectors in Mr. McNulty's basement laboratory had caught fire and melted due to a power surge. The fire department personnel removed the two surge protectors but did not

4

report removing anything else.  Eversource Energy also responded to the August 15 incident, and Mr. McNulty testified that Eversource personnel went into Mr. McNulty's basement laboratory to investigate the electrical fire.  *Id.* at 74–80.  The surge protectors that had burned were a foot or two away from the box that contained Mr. McNulty's prototypes, including the MediKey device, but Mr. McNulty testified that he did not inspect the box at that time because it did not look as if it had been affected by the fire.  *Id.* at 80–81.

Third, on September 23, 2018, another fire occurred in the McNultys' home.  When Mr. McNulty noticed smoke and the flashing of lights in the house he went to the basement laboratory, where he saw that a surge protector was on fire.  Mr. McNulty did not call the fire department at that time, but called Eversource instead.  After examining the utility equipment outside the house, the Eversource personnel discovered an exposed hot wire that was causing the electrical disturbances in the McNultys' home and elsewhere in the neighborhood.  *Id.* at 81–86.  In an interrogatory response, IOENGINE represented that two electricians had responded to the McNulty home on August 15 and September 23.  The electricians reported to Mr. McNulty that they did not recall removing anything from the scene of the fires, but that they may have moved boxes from the area of the fires.  Dkt. No. 368-1, Exh. 30, at 12.

In about March 2019, Mr. McNulty decided to retrieve the prototypes from his basement and return them to his attorneys, who at that point had completed their move to the Dechert firm. According to Mr. McNulty, it was at that time that he noticed the MediKey device and one other prototype were missing.[3]  He testified that when he went to retrieve the prototypes, they were no longer stored in an orderly fashion in the box he had obtained from Simpson Thacher.  Instead, he

---

[3] Mr. McNulty testified in a deposition that he later noticed that a third prototype was missing as well.  Dkt. No. 375-1, Exh. E, at 271–72.

found that the prototypes appeared to be in a different box. *Id.* at 87; Dkt. No. 375-1, Exh. B, at 176. The box where the prototypes were now located, according to Mr. McNulty, appeared to be "a little bit older and dingier" than the box he had obtained from Simpson Thacher, in which the prototypes had previously been stored. Mr. McNulty said that he recognized the box in which the prototypes were now stored as being one of the empty boxes he had kept in his basement. Dkt. No. 451 at 86–87, 107. The Simpson Thacher box, he said, was missing. *Id.* In addition, Mr. McNulty noticed that the prototypes appeared to be thrown about in the box "like a tossed salad" in a "very disheveled" manner, whereas previously they had been stored in an orderly fashion, with the MediKey device on top. *Id.* at 108.

Mr. McNulty testified that he realized at that time that the MediKey device and one other prototype were not in the box where the other prototypes were now located. He testified that he "tore [that box] to pieces" looking for the MediKey but did not find it, nor could he find the missing prototypes anywhere in his laboratory. *Id.* at 87–88, 94.

At the hearing and in his deposition, Mr. McNulty speculated that someone from either the fire department or the power company may have taken the MediKey device or may have moved the prototypes into the second box and that the MediKey device may have been lost at that point. *Id.* at 43–44; Dkt. No. 368-1, Exh. 29, at 275–76. There is, however, no corroborating evidence to support either of those suppositions.

Mr. McNulty claims that after discovering that the MediKey prototype was missing, he took several steps to locate the MediKey device, including searching his basement laboratory, inquiring with the fire department and the power company, and visiting a local recycling center. Dkt. No. 451 at 88–93; Dkt. No. 368-1, Exh. 30, at 11–13. Those efforts were unsuccessful. Mr. McNulty testified

6

that he informed his attorneys as of March 2019 that the MediKey device was missing. Dkt. No. 451 at 44–45.

On May 15, 2019, I denied IOENGINE's motion to dismiss PayPal's inequitable conduct claims. Dkt. No. 70. Two weeks later, in the course of responding to a discovery request from PayPal, IOENGINE revealed to the defendants that the MediKey device was missing. PayPal and Ingenico then commenced discovery relating to the disappearance of the MediKey, and on December 6, 2021, PayPal and Ingenico filed their motion seeking spoliation sanctions relating to the disappearance of the MediKey.

## II. Discussion

As a threshold matter, the parties disagree about the legal standard that should be applied to the defendants' spoliation claims. PayPal and Ingenico argue that because the MediKey device contained an executable file, "MediKey.exe," the MediKey device should be treated as consisting of electronically stored information ("ESI"). The spoliation standard applicable to the failure to preserve ESI is set forth in Federal Rule of Civil Procedure 37(e). IOENGINE, however, argues that because the MediKey is a physical device, Rule 37(e) does not apply, and sanctions for spoliation are governed not by Rule 37(e) but by the case law applying the court's inherent authority to address cases involving alleged spoliation of evidence.

Rule 37(e) provides that "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court may take steps to cure any prejudice from the loss of the evidence. The failure to take reasonable steps to preserve ESI "equate[s] to roughly a negligence standard." *Leidig v. Buzzfeed, Inc.*, No. 16-CIV-542, 2017 WL 6512353, at *10 (S.D.N.Y. Dec. 19, 2017). Under the court's inherent authority, spoliation

occurs if: (1) "the evidence was in the party's control"; (2) "the evidence is relevant to the claims or defenses in the case"; (3) "there has been actual suppression or withholding of evidence"; and (4) "the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). Because the MediKey is a physical device that contains ESI, both standards apply to a degree. I will therefore consider PayPal and Ingenico's motion under both standards.

A. Inherent Authority

I first address whether spoliation sanctions would be appropriate under the court's inherent authority. Of the elements articulated by the Third Circuit in the *Bull* case, the only element in serious dispute is whether "there has been actual suppression or withholding of the evidence." *See Bull*, 665 F.3d at 73. In order to find that there has been actual suppression or withholding of evidence, the court must find that the party in possession of the evidence acted intentionally or in bad faith. *See id.* at 79. As the court put it more succinctly, "[w]ithholding requires intent." *Id.*

PayPal and Ingenico identify several points that, in their view, establish that Mr. McNulty acted in bad faith with regard to the disappearance of the MediKey. They argue that (1) Mr. McNulty had both a motive and an opportunity to dispose of the MediKey device; (2) the timing of the MediKey's disappearance is strongly suggestive of an intent to make the device unavailable for use in the litigation; (3) the fact that only the MediKey and two other devices went missing, from among a much larger group of prototypes, is suspicious; (4) IOENGINE's failure to disclose the disappearance of the MediKey as soon as it was discovered evidences bad faith; and (5) Mr. McNulty's narrative regarding the MediKey's disappearance has been inconsistent in various respects and is not credible. Dkt. No. 367 at 14–16.

8

With respect to the issue of Mr. McNulty's motive and opportunity to dispose of the MediKey device, there is no doubt that Mr. McNulty had the opportunity to dispose of the MediKey. Whether he had a motive to do so, however, is less clear. He would have a motive to dispose of the device only if he believed that evidence as to the contents of the device could be unfavorable to IOENGINE. It would not be reasonable to base a finding that Mr. McNulty disposed of the MediKey based on an unproven assumption that the device would have hurt IOENGINE's case.

IOENGINE maintains that the MediKey functioned as Mr. McNulty claimed it did in his 2010 declaration to the PTO, and IOENGINE cites test results from the Imation case to support that assertion. Dkt. No. 374 at 12 (citing Dkt. No. 375-2, Exh. Y, at ¶ 21). If IOENGINE believes that an examination of the MediKey would provide evidence that could rebut a charge of inequitable conduct, Mr. McNulty would have no motive to destroy or conceal the device; in fact, his motivation would be just the opposite. Accordingly, based on the present state of the record, I do not find that Mr. McNulty's supposed motive to remove the MediKey device as potential evidence weighs in favor of a finding of bad faith on his part.

With respect to Mr. McNulty's narrative regarding the events leading to the disappearance of the MediKey, the defendants emphatically insist that the narrative has been inconsistent, is at odds with indisputable evidence in the case, and ultimately offers an implausible explanation for how the device went missing. In some respects, the defendants' argument is overstated and unconvincing. Many of the problems with Mr. McNulty's account appear to stem from his mixing up the details relating to the three electrical incidents at his home between August and September 2018. For example, in his deposition, Mr. McNulty testified that the fires at his home occurred on August 7 and August 15, when in fact the evidence indicates that the two fires occurred on August 15 and September 23. Mr. McNulty also confused some of the details of the August 15 fire and the September 23 fire.

And he made mistakes at his depositions about who called the fire department on one occasion, and whether he called the fire department rather than the power company on another occasion. He subsequently corrected those mistakes, albeit clumsily, in a series of steps, including corrections to his depositions in which he corrected certain errors, a subsequent declaration in which he corrected other errors, and testimony at the spoliation hearing in which he added new details to the account he gave in his deposition testimony.

The problem for the defendants is that those errors in Mr. McNulty's account do not significantly advance their spoliation argument. Mr. McNulty's mistakes regarding the events of August and September 2018 may indicate that Mr. McNulty has poor recollection or was not adequately prepared for his deposition, but the inconsistencies in his testimony about the relevant events do not themselves prove that his account of the disappearance of the MediKey device is false. Most of Mr. McNulty's mistakes regarding the three incidents at his home can be reconciled if his explanation is accepted, i.e., that he confused the dates of the three events and was mistaken as to whether the fire department or the power company was called on those occasions. Other inconsistencies, such as whether it was he or his wife who called the fire department are inconsequential, because the fire department responded twice, and it is therefore clear that one or the other of the McNultys called the fire department on those two occasions. Similarly, while Mr. McNulty testified that he believed he returned the prototypes to the Dechert firm in about March 2019, which was at odds with the evidence that he returned the prototypes in February 2019, that is a minor discrepancy that is entitled to little weight.

In view of the record evidence and the testimony of other witnesses, I find that the three incidents described by Mr. McNulty did in fact occur. In light of the evidence other than the testimony of Mr. and Mrs. McNulty, it is indisputable that the electrical incident of August 7 and the fire on

August 15 both occurred, as the McNultys testified.  Although PayPal expresses skepticism as to whether the September 23 fire occurred, Mr. McNulty produced photographic evidence that he contended related to that incident.  More importantly, it would have been a simple matter for PayPal to prove that the September 23 incident did not occur, such as by obtaining records from Eversource Energy that would disprove Mr. McNulty's assertion that Eversource's technicians responded to a service call on that date and discovered a "hot wire" in a nearby transformer that was causing electrical disturbances in the McNultys' house and elsewhere in the neighborhood.  No such evidence was presented.

Beyond that, it is not clear what reason Mr. McNulty would have to falsify details such as whether it was he, rather than his wife, who called the fire department on August 15th, since none of those details are pertinent to whether the MediKey's disappearance is attributable to events that occurred during those incidents.  *See id*.  The more plausible explanation for the inconsistencies in Mr. McNulty's accounts regarding the events on those three days is that he does not remember those details with clarity and initially mixed up the dates of the two fires.  I therefore attach relatively little significance to the errors in Mr. McNulty's narrative regarding the fires.[4]

What is more troubling is that it is difficult to conceive of a plausible scenario, consistent with Mr. McNulty's testimony, that explains the disappearance of the MediKey device.  Mr. McNulty

---

[4] PayPal argues that the testimony of Mr. McNulty's wife is also inconsistent with Mr. McNulty's testimony regarding the 2018 fires at the McNulty home.  Mrs. McNulty testified about a fire that occurred some time previously at the McNultys' home, which she referred to as the "first fire."  Dkt. No. 375-1, Exh. D at 47–48.  She referred to the electrical event of August 7, 2018, when the fallen tree damaged the McNulty's house and equipment on the utility pole nearby as the "second fire."  *Id.* at 48–56.  She also testified about what she referred to as the "third fire."  *Id.* at 56–62.  In context, her testimony about the "third fire" appears to relate to the August 15, 2018, event.  Assuming her reference to the "third fire" related to the August 15 event, her testimony was not inconsistent with that of Mr. McNulty.

11

insists that the MediKey device was securely stored in his locked basement laboratory from early 2018 to early 2019, and the only persons other than himself and his wife that he identified as having access to the basement laboratory were the fire department personnel, the power company representatives, and his electricians, all of whom responded to one or more of the incidents in August and September 2018.  One of the members of the fire department who responded to the August 15 fire testified by deposition that the only objects taken from the McNultys' basement were the two surge protectors that were destroyed in that fire.  Dkt. No. 375-1, Exh. L, at 28, 34–35.  And there is no evidence in the record to suggest that the power company representatives or Mr. McNulty's electricians took the MediKey device or the other two missing prototypes.  Importantly, there is no evidence—and little reason to suppose—that any of the people who were in the McNultys' basement during the August and September incidents (1) moved the prototypes from the original box to an older one; (2) in the course of so doing either took or misplaced three of the prototypes; (3) took the original box out of the home; and (4) disposed of the three missing prototypes in a place where they could not thereafter be located.

      Other aspects of the story also give cause for concern.  The fact that the MediKey's disappearance was not communicated to PayPal until shortly after I denied IOENGINE's motion to dismiss PayPal's inequitable conduct claim supports an inference that Mr. McNulty may have wanted to avoid having the MediKey device become a central focus of the inequitable conduct proceeding, as it was in the Imation case.  And it is difficult to account for the fact that only the MediKey and two other prototypes disappeared, while the other prototypes that were stored in the same box remained in Mr. McNulty's possession.

      The problem for the defendants, however, is the absence of the proverbial smoking gun.  While the scenario suggested by Mr. McNulty's account of the loss of the MediKey seems somewhat far-

fetched, unlikely events do sometimes occur, and there is nothing in the record as it now stands that convinces me that Mr. McNulty's story is a wholesale fabrication. Given the absence of any affirmative evidence indicating that Mr. McNulty took steps to dispose of the MediKey, I am not prepared to conclude that Mr. McNulty has repeatedly perjured himself, has fabricated an unlikely story to explain the disappearance of the MediKey device, and has intentionally disposed of potentially important evidence. To be sure, he may have been negligent in failing to examine the box of prototypes following the incidents in August and September 2018, as discussed below. But negligence is not sufficient to justify a sanction for spoliation under the court's inherent authority. *State Farm Fire & Cas. Co. v. Cohen*, No. CV 19-1947, 2020 WL 5369626, at *7 (E.D. Pa. Sept. 8, 2020) (citing *Bull*, 665 F.3d at 79 & n.13). Accordingly, based on the record before me at present, I find that PayPal and Ingenico have not established that the MediKey was actually suppressed or withheld. Therefore, absent the development of further evidence bearing on the disappearance of the MediKey, I will not impose a spoliation sanction at trial under the court's inherent authority.

  B. <u>Rule 37(e)</u>

  With respect to Rule 37(e), I must decide whether Mr. McNulty and IOENGINE took reasonable steps to preserve the MediKey device and its contents. PayPal and Ingenico argue that Mr. McNulty's conduct was unreasonable in three respects. First, they argue that Mr. McNulty should have left the prototypes with IOENGINE's counsel instead of retrieving them in advance of the attorneys' move to the Dechert firm. Dkt. No. 367 at 11–12. Second, they argue that IOENGINE should at least have backed up the contents of the MediKey device at some point before the prototypes were returned to Mr. McNulty. *Id.* Third, they argue that Mr. McNulty's failure to check on the status of the prototypes after the 2018 fires was unreasonable. Dkt. No. 381 at 6–7.

13

As for the first argument, it was not unreasonable for Mr. McNulty to retrieve the prototypes from Simpson Thacher prior to IOENGINE's attorneys' move to Dechert.  Since the prototypes needed to be moved from Simpson Thacher when the case was transferred to the Dechert firm, the move created at least some risk that the prototypes would be damaged, destroyed, or lost during the transportation process.  And Mr. McNulty's laboratory, as he describes it, would seem to be a reasonable place to store the prototypes.  It is kept locked, has dehumidification and air purification systems, and is generally not accessed by anyone other than Mr. McNulty.  Although, in hindsight, it may have been preferable for the prototypes to remain with IOENGINE's counsel, I cannot say that it was objectively unreasonable for Mr. McNulty to retrieve the prototypes from IOENGINE's counsel and store them in his laboratory.[5]

As for the second argument, the failure to copy or back up the contents of the MediKey device was also not unreasonable.  Mr. McNulty contends that his prototypes are irreplaceable, and any attempt to access or modify the contents of those devices carries some risk.  *See, e.g.*, Dkt. No. 304 at 4; Dkt. No. 321 at 2–3; Dkt. No. 374 at 9.  In addition, Mr. McNulty testified that another one of his MediKey prototypes had previously been destroyed when a team of engineers attempted to extract the firmware from that device.  Dkt. No. 451 at 63–64.  Although it is true that the MediKey device was tested twice during the Imation litigation without apparent incident, it was not unreasonable for IOENGINE to seek to avoid the risk associated with attempting to copy the contents of the MediKey device.  That is especially true given that the MediKey.exe software would appear to be of limited use

---

[5] PayPal argued at the hearing that it was unreasonable for the prototypes to be held by Mr. McNulty because he was "the one person on earth who has a motive to destroy [the MediKey]." Dkt. No. 451 at 152. That argument requires me to assume that Mr. McNulty had a reason to believe the MediKey device would be damaging to his case if it were provided to PayPal and Ingenico. As noted, that is a conclusion I am not willing to reach on the record before me.

without the accompanying firmware and physical device. *See* Dkt. No. 374 at 17. Although hindsight suggests that attempting to create a backup for the MediKey might have enabled IOENGINE to preserve at least some evidence regarding the functionality of the MediKey device, it was reasonable for IOENGINE not to back up the contents of the MediKey prior to the transfer of the prototypes to Mr. McNulty's possession in 2018.[6]

As for the third argument, I find that Mr. McNulty was negligent in failing to inspect or move the box of prototypes following the fires in August and September 2018. Because the PayPal and Ingenico cases were both initiated before August 2018, Mr. McNulty had a duty to preserve the prototypes at the time of the fires, and his failure to take sufficient measures to ensure that the prototypes were undamaged and remained in his possession after the fires rendered his conduct unreasonable under the circumstances. Had Mr. McNulty conducted a post-fire inspection of the box in which the prototypes were stored, he may have noticed the disappearance of the MediKey at that time and might have been able to locate it before it went missing for good. It is reasonable to think that the recollections of everyone involved, including the fire department and power company officials, would have been clearer at that time than they were several months later, when Mr. McNulty claims he noticed that the three prototypes were missing and began questioning others as to what may have happened to the devices. Moreover, the box of prototypes was located close to the surge protectors that caught fire on August 15. Given the importance of the prototypes to the ongoing cases, it would have been reasonable to check on the prototypes even if there were no apparent damage to the outside of the box in which they were contained. The same applies to Mr. McNulty's failure to

---

[6] As IOENGINE points out, if IOENGINE had unilaterally tried to back up the contents of the MediKey and that effort had resulted in damaging the device, a plausible argument could have been made that attempting such a procedure constituted spoliation given the risks associated with subjecting Mr. McNulty's prototype devices to testing and copying. Dkt. No. 374 at 9.

inspect the prototypes after the September 23 fire and his failure to recognize until early 2019 that the prototypes were in a different box from the one he had obtained from Simpson Thacher. As a result, I find that, even accepting Mr. McNulty's version of the facts, the disappearance of the MediKey is at least partially attributable to Mr. McNulty's failure to take reasonable steps to preserve the MediKey following the fires that occurred in August and September 2018.

To be sure, under Rule 37(e) an adverse inference sanction is available "only upon finding that the party [in possession of the ESI] acted with the intent to deprive another party of the information's use." Fed. R. Civ. P. 37(e)(2); *see also Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612, 618 n.6 (E.D. Pa. 2016) (The enactment of Rule 37(e) "does not appear to have substantively altered the moving party's burden, in this Circuit, of showing that ESI was destroyed in 'bad faith' when requesting an adverse inference."). As noted, I am not prepared to make a finding on the present record that Mr. McNulty disposed of the MediKey device purposely and in bad faith.

While I am not prepared to find bad faith on the record before me, Rule 37(e)(1) contemplates the award of a lesser sanction than an adverse inference in cases not involving bad faith or intentional misconduct. In those situations, the court "may order measures no greater than necessary to cure the prejudice" upon a finding of "prejudice to another party from loss of the information." Fed. R. Civ. P. 37(e)(1). Because I find that Mr. McNulty was negligent, Rule 37(e)(1) authorizes me to enter a sanction to cure any prejudice to PayPal and Ingenico. At this point, however, the risk of prejudice to PayPal and Ingenico at the jury trial from the disappearance of the MediKey device appears to be minimal. PayPal and Ingenico intend to rely on the MediKey device as evidence of inequitable conduct, which is an issue that all parties agree is to be tried separately to the court. Dkt. No. 451 at 140–41. And the parties have agreed that the proceedings on this spoliation motion may be included as part of the in the record in any inequitable conduct trial that is conducted later in the proceedings.

16

*Id.* at 141.  I would therefore be free to weigh the evidence of the MediKey's disappearance, including any further evidence that the parties may offer on that issue, in determining whether the handling of the MediKey is relevant to the allegations of inequitable conduct.  In weighing that evidence, I reserve the right to order additional remedial measures if I find them necessary to cure any prejudice to PayPal and Ingenico during that proceeding.

The only purpose for which it appears that the MediKey is likely to be offered at the jury trial is as part of the "invention story," i.e., as part of the background events leading to the issuance of the patents in suit.  But the MediKey device appears to be of little importance in the invention story, and IOENGINE has disclaimed reliance on the MediKey to establish "any particular functionality" for purposes of showing diligence by IOENGINE in developing the claimed inventions.  Dkt. No. 374 at 18.  Moreover, to the extent that IOENGINE might offer evidence that Mr. McNulty was generally developing the MediKey for some period of time, the MediKey's disappearance would appear to have little impact on that assertion or the defendants' ability to respond to it.  After all, no one appears to dispute that the MediKey existed and was one of Mr. McNulty's prototypes.  The live dispute with respect to the MediKey is whether that device performed certain specific functions as described by Mr. McNulty to the PTO.  That issue may well be important in the inequitable conduct proceeding before me, but it is not clear how that issue could be implicated in the jury trial in this case.

Should the disappearance of the MediKey become relevant to issues raised during the jury trial in a way that prejudices PayPal and Ingenico, I will permit PayPal and Ingenico to offer evidence of the MediKey's disappearance as a sanction under Rule 37(e)(1) to cure any prejudice resulting from the MediKey's disappearance.  *See Eur. v. Equinox Holdings, Inc.*, No. 20-CV-7787, 2022 WL 832027, at *7 (S.D.N.Y. Mar. 21, 2022) (allowing the prejudiced party to "present evidence to the jury that the [evidence] was lost" when the record was "silent as to any affirmative conduct" by the

17

spoliating party). But absent further evidence of spoliation, I will not give an instruction to the jury directing that it must, or may, draw an adverse inference against IOENGINE based on the disappearance of the MediKey. *See* Fed. R. Civ. P. 37(e)(2)(B) (limiting adverse inference instructions to situations in which there was an intent to deprive, but offering no such limitation regarding the introduction of evidence regarding the information's disappearance).

### III. Conclusion

In summary, although various aspects of Mr. McNulty's account of the circumstances surrounding the disappearance of the MediKey device are troubling, I do not find on the record before me at this point that PayPal and Ingenico have shown that a spoliation sanction at the jury trial in this case is warranted under either Rule 37(e) or under the court's inherent authority. Should the disappearance of the MediKey device become relevant at trial in a way that is prejudicial to PayPal and Ingenico, I will permit PayPal and Ingenico to offer evidence of the MediKey's disappearance at that time. Furthermore, I reserve the right to order additional remedial measures should they become necessary during the inequitable conduct proceedings in this case. At this point, however, the motion for spoliation sanctions in the form of an adverse inference jury instruction is denied. In addition, in light of the limited relief granted in response to PayPal's spoliation motion, PayPal's request for an award of attorneys' fees and costs as a remedy for the prejudice stemming from its discovery efforts directed to the spoliation issue and the presentation of its spoliation motion is also denied.

In an abundance of caution, this order has been filed under seal because the parties' briefs and exhibits regarding the present motions were filed under seal. *See, e.g.*, Dkt. Nos. 367, 374, 381, 383-2. Within three days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal. Any request that portions of the

order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

    IT IS SO ORDERED.

    SIGNED this 3rd day of May, 2022.

                                            WILLIAM C. BRYSON
                                            UNITED STATES CIRCUIT JUDGE